# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DEBRA B. FERRARA** | **CIVIL ACTION** |
| **VERSUS** | **NO: 07-7197-JCZ-SS** |
| **MICHAEL J. ASTRUE, COMMISSIONER OF**<br>**SOCIAL SECURITY ADMINISTRATION** | |

## REPORT AND RECOMMENDATION

The plaintiff, Debra B. Ferrara ("Ferrara"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423, and her claim for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382(a)(3).

## PROCEDURAL HISTORY

On July 21, 2004, Ferrara submitted an application for disability benefits, r. 71-73, reporting that she became disabled on June 1, 2004 because of neck pain and migraine headaches. R. 61 and 71. On October 14, 2004, the application was denied. R. 61-64. There were hearings before an Administrative Law Judge ("ALJ") on March 7 and July 27, 2007. R. 332-360 and 361-84. On August 3, 2007, the ALJ issued an unfavorable decision. R. 11-22. On September 26, 2007, the Appeals Council denied the request for review. R. 5-6.

On October 23, 2007, Ferrara filed a complaint in federal court. Rec. doc. 1. The Commissioner filed an answer on March 24, 2008. Rec. doc. 8. The parties filed cross-motions for

summary judgment.  Rec. docs. 10 and 15.   Ferrara has been represented by counsel throughout these proceedings.

## STATEMENT OF ISSUE ON APPEAL

1.  Did the ALJ err in reaching his third finding of fact and conclusion of law by omitting comments and findings by Ferrara's physicians?

2.  Did the ALJ err in finding that Ferrara's impairments did not meet or medically equal the listed impairments?

3.  Did the ALJ err in finding that Ferrara possessed the residual functional capacity to perform light work and that she was capable of performing her past relevant work as a dental assistant?

4.  Did the ALJ err in finding that Ferrara had not been under a disability from June 1, 2004 through the date of the decision on August 3, 2007?

## THE COMMISSIONER'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following findings relevant to the issues on appeal:

1.  Ferrara meets the insured status requirements of the Social Security Act through December 31, 2008.

2.  Ferrara has not engaged in substantial gainful activity since June 1, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 *et seq.*).

3.  Ferrara has the following severe impairments: status post anterior cervical fusion at C5-6 with allograft and plate possible early multiple sclerosis (20 CFR 404.1520(c) and 416.920(c)).

4.  Ferrara does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  Ferrara has the residual functional capacity to perform light work with restrictions on working around moving machinery, working at heights, or driving and in environments where a loss of consciousness would endanger her or others.

6.  Ferrara is capable of performing her past relevant work as dental assistant.  This work does not require the performance of work-related activities precluded by Ferrara's residual functional capacity (20 CFR 404.1564 and 416.965).

2

7.    Ferrara has not been under a disability, as defined in the Social Security Act, from June 1, 2004 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

R. 16-21.

## ANALYSIS

a.    **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000); Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Newton, 209 F.3d at 452. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the evidence, try the issues de novo or substitute its judgment for the Commissioner's.  Id.; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Villa, 895 F.2d at 1022; Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (1997).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920; Newton v. Apfel, 209 F.3d at 453; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[1]  The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry.  Id.  If she

---

[1]  The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989). When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ultimate burden of persuasion shifts back to the claimant." Id.; accord Selders, 914 F.2d at 618.

The Court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history." Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995).  "The Commissioner, rather than the courts, must resolve conflicts in the evidence." Id.

b.     **Testimony at hearing on March 7, 2007.**

At the time of this hearing, Ferrara had been divorced for about five years.  She had three minor children and lived with her parents, an aunt, and the three children in her mother's house.  R. 346-47.  Ferrara was engaged.  Her fiancé did not live in the house with Ferrara.  R. 352.

Ferrara's mother helped her with the laundry.  R. 347.  She was unable to clean the house because of pain.  R. 347-48.  About once a week she was able to wash the dishes and do some laundry.  She rarely cooked.  R. 349.

In a typical day she got her children ready for and brought them to school.  R. 349.  After doing so, she relaxed with a heating pad for an hour or so.  R. 350.  She tried to move around and walk.  R. 350.  She was asked about a particular day just prior to the hearing.  She reported that she had spent the day lying on a sofa until it was time to bring her children home from school.  R. 351. When her children came home, she made sure they did their homework.  After that she went to bed.

R. 351.

Ferrara did not finish high school nor obtain a GED. She was able to take some courses in college and vocational school as a dental assistant for oral surgery. R. 342-43. She obtained a medical assistant certificate and had worked as one. R. 343. In 2005, she worked for an oral surgeon for about three months. She was fired at the end of three months because she could not hold the instruments. R. 344-45. She was earning $13 per hour and received a total of $7,700 for this work. R. 346. She last worked in May of 2006 as a receptionist in a dentist's office and was fired at the end of two weeks. R. 344.

Ferrara experienced pain in her neck, which went down her left arm. She experienced numbness in her left arm and fingers. R. 348. Her medication was prescribed by Dr. Hunter at the Access Medical Clinic, a pain management clinic. She took Lorcet, Soma, Xanax and occasionally Midrin. R. 351-52. She took pain medication about every four to six hours. R. 355. She reported that she was fired from the dental reception job because the office manager thought she "sounded out of it. . . ." R. 355. She was told that her speech was slurred. R. 355. She reported that she had a hole in her heart. R. 356. In June or July of 2006, she began to have episodes where she passed out. R. 356. She had experienced about thirty to forty such episodes by the time of the hearing in March 2007. R. 357. She was told that an MRI revealed white patches on her brain. R. 357.

Ferrara had two auto accidents in 2006. The first occurred in July. Her fiancé was driving. Ferrara's car was totaled in this accident. R. 352. She had a claim pending for this accident. R. 354. On October 16, 2006, there was a second accident. The car was repaired. She was considering a claim for that accident. R. 354.

At the conclusion of his examination, the ALJ reported that he would send Ferrara to a doctor

6

for an evaluation.  R. 355 and 358.

c.     **Testimony at hearing on July 27, 2007.**[2]

Ferrara reported that she had a fusion at C5-6 on August 25, 2004.  R. 364.  Prior to the surgery she was not able to lift her left arm.  R. 364-65.  Since the surgery she was not able to hold medical instruments.  R. 365.  She did not consider the surgery successful.  She remained in a lot of pain.  On some days she was not able to get out of bed.  R. 367.  At the time of the hearing, she experienced pain in her left shoulder and neck.  R. 367.

Before she worked as a dental assistant, she worked with her former husband as a truck driver.  R. 366.  She was on Medicaid.  R. 368.  She testified about the hole in her heart and blood clots shooting from her heart to her brain.  R. 368.  Her medications included Lorcet, Soma and Xanax.  R 368.  Since the auto accidents, she had migraine headaches.  R. 369.  Her neck pain became worse after the auto accidents.  R. 373.

Ferrara reported that  a doctor had found a sign of multiple sclerosis.  R. 370-72.  Ferrara reported that she was told she had a one-time condition called AMED attributable to inflammation of the brain.  Three weeks later it was not inflamed.  R. 371-72.  She reported that she had lesions in the brain.  R. 373.

Ferrara reported that she had three bulging discs in her back.  R. 373.  She was unable to pick up objects.  She could not sit for a very long time.  R. 373.  She experienced short-term memory loss. R. 374.  She was required to stop driving a car.  R. 374.

Ferrara's mother, Phyllis Burkhart, testified that Ferrara had moved into the house where her

---

[2]  The ALJ considered the July 27, 2007 a *de novo* hearing.  R. 364.  The testimony included information, for example Ferrara's education, which was covered in the hearing on March 7, 2007.  This summary of the July 27, 2007 hearing includes only new information.

fiancé lived.  R. 380.  Ms. Burkhart reported that: (1) she saw her daughter about five days a week and sometimes every day; (2) she had seen her daughter pass out and experience slurred speech; (3) during these episodes her daughter went limp but was not unconscious; (4) she had no memory of the episodes; (5) she experienced them about once every two to three weeks; and (6) she had at least one of the episodes while she was driving.  R. 376-78.  Ms. Burkhart reported that Ferrara did not do housework.  Her mother took care of the two youngest children.  R. 380.

The vocational expert testified that Ferrara's dental assistant work was light duty for physical demands and skilled work.  Her work as a tractor trailer driver was medium duty and semi-skilled. R. 381.  Based upon the ALJ's hypothetical question, the vocational expert reported that she could not perform her prior work as tractor trailer driver, but she could work as a dental assistant.  R. 381-82.  If Ferrara was frequently dropping items she would not be able to maintain employment wherever she worked.  R. 382.  If she had chronic episodes of passing out, she could not maintain a job.  R. 383.

c.  **Medical Evidence**.

On December 6, 1999, Ferrara underwent lithotripsy treatment for a stone in her left kidney. R. 143.

On January 20, 2003, Ferrara was seen at the Ochsner Clinic Foundation ("Ochsner") emergency room with complaints of a sore throat and a cough.  She was described as alert, orientated and in no acute distress.  Medication was prescribed.  R. 140.  The diagnosis was bronchitis. R. 141-42. On April 26, 2003, she was seen at the East Jefferson General Hospital ("East Jefferson") emergency room.  She reported that: (a) she was in an auto accident three days before; (b) her right knee hit the dashboard; and (c) she had pain in the knee radiating down to the ankle.

X-rays were not taken.  She was given medication.  Her injury was described as a contusion.  R. 153-54.  On July 18, 2003, she was seen at the East Jefferson emergency room for right hip pain.  She reported intermittent pain in her right knee since the April 2003 accident.  The pain had become worse.  She was under a lot of stress from a divorce.  R. 149.  X-rays of the right hip and knee were negative.  The diagnosis was sciatica.  Her condition at discharge was good.  R. 150-52.  On September 7, 2003, she returned to the East Jefferson emergency room for right leg pain.  She was described as in moderate distress.  An ultrasound for the right lower leg was negative.  Medication was prescribed.  She was to follow up with an orthopedic physician.  R. 145-47.

On January 16, 2004, Ferrara was seen by Dr. Salvador Murra, a neurologist, with complaints of pain in her right hip, knee and down to the foot.  R. 170-75.  She reported that the pain began in the April 2003 auto accident.  R.174.  On January 20 and 23, 2004, she returned to Dr. Murra.  R. 167-68.  On January 26, 2004, she picked up a prescription for Percocet.  R. 167.  A January 30, 2004 MRI of Ferrara's lumbar spine was normal.  R. 148.  On February 3, 2004, she was seen by Dr. Murra.  R. 165-66.  On February 13, 2004, at Dr. Mura's request, she underwent a myelogram for the lumbar spine.  The impression was that the lumbar spine appeared within a normal range except for minor lumbar spondylosis change.  R. 161.  A CT scan of the same date revealed a mild disc bulge at L4-5.  R. 162-63.  A prescription for Percocet was refilled  R. 164.

On June 26, 2004, Ferrara was seen at the Ochsner emergency room with complaints of pain, limited movement of her left arm, and pain in the left side of her neck.  She described it as a chronic pinched nerve pain.  R. 281, 283-285.  On June 27, 2004, she returned to the Ochsner emergency room with complaints of pain in the left arm and left side of the neck.  She reported an onset of acute pain about two days before.  R. 127-135 and 278-80.  She was admitted to Ochsner hospital from

June 28 to July 2, 2004 with complaints of pain in her left arm, shoulder and left side of neck.  The diagnosis was a herniated disc at C5-6 with C6 radiculopathy.  A nerve block was done at C6.  R. 126.  On July 2, 2004, she was discharged with instructions to avoid heavy lifting, but she could do light duty work.  R. 125.  On July 2, 2004, Dr. Frank Wharton[3] at Ochsner reported that: (a) an MRI revealed C5-C6 osteophytes and a focal disc bulge; (b) Ferrara was a possible surgical candidate; (c) she reported that the pain was significantly less after the nerve block; and (d) she was limited to light duty on her return to work.  R. 137-38, 270 and 277.

On July 12, 2004, Ferrara was seen by Dr. Najeeb Thomas[4] at Ochsner.  He  reported that: (a) Ferrara had left arm pain; (b) she had a herniated disc at C5-6 with C6 radiculopathy; (c) she was in a lot of pain and on pain medication; and (d) she needed surgery.  He referred her to Dr. Tender at Medical Center of Louisiana at New Orleans ("Charity") who accepted Medicaid.  R. 124 and 282.

On August 2, 2004, Ferrara was seen at Charity for neck pain.  R. 182 and 207.  On August 15, 2004, an anterior cervical discectomy and fusion with allograft and plat at C5-6 was performed by Dr. Tender.[5]  R. 183-85 and 274-76.  On August 26, 2004, she was seen at Charity.  Outpatient physical therapy was to be scheduled when she was cleared by her doctor.  R. 186-88.  On August 30, 2004, she was instructed to refrain from heavy lifting for four weeks.  R. 189.  She complained of mild neck pain and sore throat.  R. 273.

On October 11, 2004, a physical capacity assessment was completed by a medical consultant

---

[3]  Dr. Wharton's speciality was not identified.

[4]  Dr. Thomas' speciality was not identified.

[5]  Dr. Tender's speciality was not identified.

for the Commissioner.  R. 208-17.

On October 29, 2004, she reported to Dr. Murra that she had pain in her neck and left arm. She was diagnosed with mild bilateral carpal tunnel syndrome.  There was no evidence of cervical radiculopathy or other neuropathies.  R. 156-59.

On April 25, 2005, an MRI of the cervical spine was conducted.  There was marginal spinal canal stenosis at the C5-6 level, the same level as the fusion.  Except for this finding, the scan was normal.  R. 271.

From September 9, 2005 through October 24, 2005, Ferrara was seen by Dr. Margaret Rice at the ACE Pain Manager, LLC.[6]  Dr. Rice reported that she recommended to Ferrara that she not do any chin to chest movement.  R. 286.

On December 2, 2005, Ferrara was seen by Dr. James Chiverton[7] at the Access Medical Clinic and completed a consent for opiate maintenance therapy for intractable pain.  R. 223-25 and 240-268.  She was seen at the clinic on eighteen occasions from December 2, 2005 through November 29, 2006.  R. 227.  Medication was prescribed during this period.  R. 228-239.  During this period Ferrara complained of constant pain to her neck, arm, wrist, head, shoulder and low back. R. 260.

On March 9, 2006, Ferrara was seen by Dr. Gary Niditch[8] at Ochsner for a potential stroke. R. 314.  She reported that she was in an auto accident in December 2005.  Prior the accident she reported that she was feeling fine and reported that she may have lost consciousness before the

---

[6]  Dr. Rice's speciality was not identified.

[7]  Dr. Chiverton's speciality was not identified.

[8]  Dr. Niditch's speciality was not identified.

accident.  She described a second incident where she lost consciousness.  Even though she had surgery on her neck, she experienced intermittent pain in her left arm.  Studies were ordered.  R. 320-22.  On May 9, 2006, she returned to Dr. Niditch.  He reported that a cervical MRI revealed multilevel degenerative changes but no particular abnormality.  She continued to report pain.  An MRI of the brain was abnormal.  It revealed multiple small areas of white matter.  One possibility was multiple sclerosis.  She was to return in four weeks for a re-assessment.  R. 318-19.  On June 22, 2006, Ferrara returned to Dr. Niditch.  She continued to experience stress related migraines.  She was referred to Dr. Robert Felberg.[9]  R. 316-17.

On June 29, 2006, Ferrara was seen by Dr. Felberg.  He reported that the white matter changes on the MRI scan were not fully consistent with a stroke.  They may have been caused by inflammation.  He was inclined toward a diagnosis of multiple sclerosis.  He referred her to Dr. Kevin McKinley, a neuroimmunology specialist, for a consult.  R. 314-15.

On July 5, 2006, Ferrara was seen by Dr. McKinley.  He reported that the visit was complicated by the presence of Ferrara's 15 year old daughter and mother.  The three generations interjected opinions.  The patient and her daughter ended up in a fight.  Ferrara reported spells during which she passed out.  When she awoke, her speech was slurred and her body felt weak.  She had chronic weakness in the left arm and residual numbness in the left thumb.  She was in emotional distress.  Dr. McKinley decided to repeat the brain MRI.  R. 311-13.  On July 12, 2006, Ferrara was seen by Dr. McKinley, who reported that the second brain MRI was much better.  307-09.

On July 31, 2006, Ferrara was seen at Ochsner by Dr. McKinley, who reported that the main issue addressed by him was the possibility of acute inflammation of the brain versus multiple

---

[9]  The speciality for Dr. Felberg was not identified.

sclerosis.  Ferrara reported some loss of consciousness when she was highly upset.  She described

an incident which occurred while she was driving.  It was not clear whether she had a seizure.  Dr.

McKinley advised her to:  (a) stop driving; (b) take medication; and (c) avoid upsetting herself.  Dr.

McKinley reported that the second brain MRI was improved over the first with partial or complete

resolution of some of the areas of enhancement and no new lesions.  The tests of the spinal fluids

were very close to normal.  A future MRI might differentiate whether she had MS or ADEM and

follow-up was necessary.  He recommended follow-up in the event of any new neurological

symptoms.  He reported that: (a) her migraines were under control and should be viewed as a

separate issue; and (b) her medication was keeping her chronic neck pain under control.  R. 289 and

304-05.  On August 14, 2006, Ferrara was seen at Ochsner by Dr. Stephen Ramee[10] on a referral

from Dr. McKinley for patent foramen ovale, a defect in the chambers of the heart.  R. 288.[11]  On

October 27, 2006, there was a x-ray of Ferrara's pelvis.  The source of her pain was not evident.  R.

287.

On April 19, 2007, Ferrara was seen by Dr. Daniel Trahant, a neurologist, for a consulting

examination at the request of the Commissioner.  Dr. Trahant found no objective symptoms to

account for her complaints of pain.  R. 294-95.

On June 15, 2007, there was a brain MRI at East Jefferson General Hospital.  There were

white matter lesions which were described as "most worrisome" for MS, but other etiologies could

not be excluded.  R. 329-31 On July 3, 2007, Dr. Michael Valdes[12] at East Jefferson reported that

---

[10]  Dr. Ramee's speciality was not identified.

[11]  This report is incomplete.  It refers to a three page report.  Only the first page is in the record.

[12]  Dr. Valdes' speciality is not identified.

Ferrara was not to engage in any hazardous activity.  R. 328.

e.      **Plaintiff's Appeal.**

Issue no.1.      Did the ALJ err in reaching his third finding of fact and conclusion of law by omitting comments and findings by Ferrara's physicians?

All of the issues raised by Ferrara, including this first issue, are considered on cross-motions for summary judgment.  The parties were ordered to: (a) address each asserted error or issue; (b) set forth the plaintiff's contentions with respect to each issue and the reasons therefor; and (c) support each contention with specific reference to the record relied upon and citations supporting plaintiff's position.  Rec. doc. 10 at 2.  More importantly,

> A party seeking summary judgment bears the initial burden of identifying those portions of the pleadings and discovery on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact.

Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993).  The Commissioner contends that Ferrara has not complied with these requirements in briefing the issues, including the first issue.  The Commissioner urges that such issues should not be considered.  Where Ferrara did not comply with these requirements, the issues will not be considered.

The ALJ found that Ferrara had the following severe impairments: status post anterior cervical fusion at C5-6 with allograft and plate;  and  possible early multiple sclerosis.  Ferrara contends that  in reaching this finding the ALJ erred because he ignored: (1) an EMG report dated January 20, 2004; and (2) an employee disciplinary report dated March 10, 2005.  The undersigned will consider these two issues.  She also contends that: (1) the ALJ ignored most of the positive findings in the medical records which she described in her memorandum; and (2) there are misstatements in the ALJ's decision about the medical records.  None of these are properly identified.  They will not be considered.  She contends that it is expected that severe pain would

result from the hardware in her neck from the cervical discectomy.  This will be addressed under issue no. 4 below.

The January 20, 2004 EMG report was ordered by Dr. Murra, a neurologist.  Ferrara's objection about the ALJ's failure to make specific reference to this report must be considered within the context of Dr. Murra's treatment.  She was seen by him on six occasions in January and February, 2004.  She did not see him again until eight months later on October 29, 2004.  R. 156-60, 165-68 and 170-75.

In the first visit, she reported pain in her right hip, knee and down into her right foot, which began after the April 2003 auto accident.  R. 170-75.  On January 20, 2004, there was a lower EMG.  The impression was chronic lumbosacral radiculopathy affecting primarily the right L5 and to a lesser degree the S1 root.  R. 176.  On January 30, 2004 a lumbar MRI was done at Dr. Murra's request. It revealed no abnormality.  R. 148.  Percocet was prescribed on January 26 and February 13, 2004.  Rec. doc. 164 and 167.  On February 13, 2004, there was a lumbar myelogram which was done at Dr. Murra's request.  It revealed that the lumbar spine appeared within the normal range except for minor lumbar spondylosis change.  R. 161.  At the same time there was a lumbar CT scan.  R. 162.

The note of the visit to Dr. Murra eight months later on October 29, 2004 does not contain a report of right leg pain.  Instead, Ferrara complained of back, neck and left arm pain.  R. 156 and 158.  An upper EMG was conducted.  Dr. Murra's report indicated that Ferrara had mild carpal tunnel syndrome.  There was no evidence of cervical radiculopathy.  R. 156.

The ALJ recorded that Ferrara was in an auto accident in April 2003.  He referred to the January 30, 2004 lumbar MRI ®. 148) and the October 29, 2004 upper EMG ®. 156).  R. 16-17.

15

He did not refer to the January 20, 2004 upper EMG ®. 176).  Ferrara's right leg pain did not persist after Dr. Murra's treatment in January and February of 2004.  By October 2004, Dr. Murra's attention shifted to her complaints of back, neck and left arm pain, which persisted after the August cervical discectomy.  In light of all of the medical evidence, there is no significance to the fact that the ALJ did not made a specific reference to the January 20, 2004 lower EMG.  He did make specific reference to the lumbar MRI in January 2004 and the upper EMG in October 2004.  The ALJ's decision demonstrates that he was conversant with the record of Dr. Murra's treatment.

An employee disciplinary form was prepared.  It referred to an incident on March 1, 2005 and reported that Ferrara was slurring her speech and dropping objects.  It reported that she was unable to follow instructions.  It referred to other incidents which occurred prior to March 1, 2005.  There is an addendum reporting that all of the incidents occurred during Ferrara's probationary period.  The form is signed by Dr. James Loyola, a dentist, on March 10 and April 29, 2005.  It was also signed by Ferrara on April 3, 2005, and she recorded that she did nothing wrong.[13]  R. 120.

The ALJ referred to Ferrara's earnings in 2005 (R. 16), and her report that she was fired because of her slurred speech and the dropping of instruments (R. 19).  He also referred to the reports of slurred speech and the dropping of objects within his consideration of the episodes of partial loss of consciousness.  R. 19-20.  The absence of a specific reference to the disciplinary form is not significant where the conditions described in the report were thoroughly considered by the ALJ.

There is substantial evidence to support the ALJ's description of Ferrara's severe impairments.  The "omissions" cited by Ferrara do not alter the ALJ's findings.

---

[13] This is an employment record; it is not a medical record.

Issue no. 2.    Did the ALJ err in finding that Ferrara's impairments did not meet or medically equal the listed impairments?

The ALJ found that Ferrara did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments.  R. 18.  The ALJ stated that:

> Special attention was given to Section 11.09 (Multiple Sclerosis).  The record fails to demonstrate that the claimant has disorganization of motor function, visual or mental impairment or significant, reproducible fatigue of motor function with muscle weakness as a result of neurological dysfunction.

R. 18.  Ferrara contends that she has a combination of impairments which meet the guidelines.  The ALJ found that Ferrara was status post anterior cervical fusion and possible early multiple sclerosis and that these were severe impairments.  R. 16.  Ferrara, however, does not refer to any particular impairments.  Instead she relies on general references to the regulations on the duration requirement, the evaluation of disability in general, opinion evidence and symptoms.  20 C.F.R. 404.1509, 1520, 1527 and 1529.  This falls short of what is required by the undersigned's order and the Fifth Circuit to support a motion for summary judgment.  Spellman, 1 F.3d at 360.

Ferrara also cites a form of judgment from Juvenile Court, Parish of Jefferson, State of Louisiana, dated July 26, 2007, which granted custody of one of the minor children of Ferrara to her parents.  R. 10.  Although the second hearing was the day after the issuance of the judgment and the grandmother testified that she was taking care of the grandchildren after her daughter moved into the home of her fiancé ®. 379), there is no mention of the judgment by either Ferrara or her mother. Ferrara's attorney did not submit the judgment until August 15, 2007, which was after the ALJ's decision.  R. 9.  The ALJ cannot be expected to refer to evidence which was not presented to him. The custody judgment was presented to the Appeals Council.  R. 9.  Even if the judgment had been before the ALJ, Ferrara does not demonstrate how it follows from the custody judgment that Ferrara

17

had a combination of impairments which met the listing requirements.  Ferrara's argument falls short

of what is required to present an issue for summary judgment.

Issue no. 3.      Did the ALJ err in finding that Ferrara possessed the residual functional capacity to
                 perform light work and that she was capable of performing her past relevant work
                 as a dental assistant?

        Ferrara urges that she was not capable of working as a dental assistant or performing any

other light duty work because of:  (1) the syncope episodes or episodes of partial or complete

consciousness; (2) the consideration by her physicians of a diagnosis of Multiple Sclerosis; (3)

evidence of muscle spasms, migraines and severe pain; (4) evidence that she dropped things; and

(5) her inability to drive a car.  The Commissioner contends that Ferrara does not set forth any

objective evidence that establishes that she cannot perform at the light exertional level.  "Light duty

work involves lifting no more than 20 pounds at a time with frequent lifting or carrying objects

weighing up to 10 pounds."  20 C.F.R. §404.1567(b).  The testimony of the vocation expert

demonstrates that if she can perform light duty work, she can work as a dental assistant.  R. 381.

        The ALJ considered Ferrara's symptoms and the extent to which they could reasonably be

accepted as consistent with the objective medical evidence.  He determined whether the impairments

could reasonably be expected to produce her pain and symptoms.  He evaluated the intensity,

persistence and limiting effects of the symptoms; and he assessed her credibility.  R. 18-19.  The

ALJ's decision demonstrates that he applied the appropriate legal standards in evaluating the

evidence.  Newton, 209 F. 3d at 452.

        The remaining issue is whether there was substantial evidence to support the decision that

Ferrara could perform light duty work.  Id.  The thrust of Ferrara's argument is that the ALJ's

determination failed to properly consider the effect of her episodes of loss of partial or complete

18

consciousness on her ability to perform light duty work.

The effort of Ferrara's physicians to determine the cause of the episodes of syncope and other symptoms lead to the suggestion that she may have multiple sclerosis.  These episodes, the possible diagnosis of MS and the reports of slurred speech and dropping object must be considered together.

The first report of slurred speech and the dropping of objects was the March 1, 2005 employee disciplinary form.  R. 120.  The first report of a loss of consciousness was the auto accident in December 2005.  R. 320-22.  At the March 9, 2006 visit to Dr. Niditch at Ochsner, she reported that there may have been a second incident with a loss of consciousness.  Id.  On May 9, 2006, Dr. Niditch raised the possibility of multiple sclerosis in response to the brain MRI.  His notes described the pattern found on the MRI as not completely characteristic of MS.  R. 318.  Dr. Felberg reviewed the MRI.  He was more inclined to think of it as MS, but he wanted more tests.  R. 314-15.  Dr. McKinley ordered a repeat MRI.  R. 311-13.  It was much improved.  R. 309.  Dr. McKinley reported, however, that Ferrara presented a "most challenging set of problems."  R. 309.  The test results of her spinal fluids did not resolve the matter.  The best that could be said was that a future MRI might help in determining whether her condition was MS or a neurological disorder characterized by inflammation of the brain.  R. 304.  A year later on June 15, 2007, there was a brain MRI at East Jefferson General Hospital.  There were white matter lesions which were described as "most worrisome" for MS, but other etiologies could not be excluded.  R. 329-31.

None of Ferrara's physicians placed any restrictions on her which would preclude light duty work.  After the nerve block on July 2, 2004, she was told to avoid heavy lifting but that she could do light duty work.  R. 125.  Two years later on July 31, 2006, Dr. McKinley advised her to stop

driving, take her medication and avoid upsetting herself.  R. 304-05.  He did not place any restrictions on her ability to perform light duty work.  A year later on July 3, 2007, Dr. Valdes reported that she should not engage in any hazardous activity.  R. 328.

> The ALJ said that:
>
> While it is possible that claimant could have multiple sclerosis, her physicians have only restricted her from driving or engaging in hazardous activities.  Such restrictions do not render a person disabled.

R. 21.  There is substantial evidence to support this finding.  None of the physicians diagnosed Ferrara with multiple sclerosis.  They all reported she may have it, but the test results did not confirm such a diagnosis.  The source of the episodes of partial consciousness remained unclear. They did not impose any restrictions other than as related to driving and engaging in hazardous activities.

Ferrara contends that the evidence of muscle spasms, migraines and severe pain precluded a finding that she could perform light work.  She also urges that the ALJ failed to properly consider the severe pain that she argues would be caused by the hardware from the cervical discectomy.  On July 31, 2006, Dr. McKinley noted that Ferrara's migraines were under control.  R. 305.  He also found that medications were keeping her complaints of neck pain under fair control. R. 305.  On April 19, 2007, Dr. Trahant determined that:

> [Ferrara] has persistent complaints of pain in the left upper extremity, as well as cervical pain; however, there are no objective abnormalities with respect to palpation of the cervical paravertebral musculature and neurological examination is entirely normal, without objective sign of cervical radiculopathy or myelopathy, or lumbar sacral radiculopathy.  Examination of the low back area is also negative for any objective abnormalities.

R. 295.  The ALJ found that in the absence of objective evidence to support Ferrara's allegations of "on-going cervical problems," the cervical fusion merely restricted her in the types of work she

20

may perform and it was not totally incapacitating. R. 20. There was substantial evidence to support this finding.

In his consideration of the issue of credibility, the ALJ referred to the factors that must be considered in addition to the objective medical evidence. R. 19 and see SSR 96-7p, 1996 WL 374186, *4 (S.S.A.). The ALJ provided affirmative findings for rejecting Ferrara's subjective complaints of pain. Falco v. Shalala, 27 F.3d 160, 163 (5th Cir. 1994). After noting the absence of objective medical evidence to support Ferrara's alleged symptoms, the ALJ noted in particular that the Access Medical Clinic had prescribed a "host of medications . . . with no documented side effects." R. 21 and R. 223-25 and 228-39. Previously, the ALJ considered her daily activities, which included the evidence of her earnings in 2004 and 2005 and the report that she worked in 2006. R. 19-20. There is substantial evidence to support the ALJ's finding that her statements concerning the intensity, persistence and limiting effects of pain were not entirely credible and her activities were self-limited. R. 21.

Ferrara's appeal is an attempt to have the undersigned re-weigh the evidence and substitute its judgment for that of the Commissioner. This is not permitted. Carey, 230 F.3d at 135.

Issue no. 4.      Did the ALJ err in finding that Ferrara had not been under a disability from June 1, 2004 through the date of the decision on August 3, 2007?

Ferrara's argument on this issue appears at Rec. doc. 11 at 8. It is one sentence. It amounts to a reference to all the arguments previously made by Ferrara. There is no need to address them a second time.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that the Commissioner's cross-motion for summary

judgment (Rec. doc. 15) be granted and Ferrara's motion for summary complaint (Rec. doc. 10) be denied and Ferrara's complaint be dismissed with prejudice.

## **OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 31st day of October, 2008.

**SALLY SHUSHAN**
**United States Magistrate Judge**